## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Ovintiv USA Inc.,                                    )
370 17th Street, Suite 1700                          )
Denver, CO 80202                                     )
                                                     )
      Plaintiff,                                  )
                                                     )
v.                                                   )          Civil Action No. [_____]
                                                     )
DEBRA A. HAALAND,                                    )
in her official capacity as Secretary of the        )
United States Department of the Interior,            )
1849 C Street N.W.                                   )
Washington, DC  20240;                               )
                                                     )
THE UNITED STATES DEPARTMENT                         )
OF THE INTERIOR,                                     )
1849 C Street, N.W.                                  )
Washington, DC 20240; and                            )
                                                     )
HOWARD CANTOR,                                       )
in his official capacity as the Acting              )
Director of the                                      )
Office of Natural Resources Revenue of the           )
United States Department of the Interior,            )
1849 C Street N.W., MS 5134                          )
Washington, DC 20240,                                )
                                                     )
      Defendants.                                 )
_____             )

## **<u>COMPLAINT</u>**

Ovintiv USA Inc. ("Ovintiv") seeks judicial review under the Administrative Procedure

Act ("APA") of a final decision of the United States Department of the Interior disallowing

Ovintiv's deduction, from oil and gas royalties, of costs of transportation—specifically,

compression—to ship production to market.

**INTRODUCTION**

1.      In this case, the Office of Natural Resources Revenue ("ONRR") determined that Ovintiv must compress its gas to 1,000 pounds per square inch gauge ("psig") to place the gas in marketable condition before it is sold at the tailgate of a third party's gas processing plant in western Colorado.  Ovintiv's gas left its various wells at a variety of pressures, some averaging as low as 114 psig, some as high as 447 psig.  Applying those pressure readings against ONRR's 1,000 psig standard, Ovintiv's lowest pressured gas needed an additional 886 psig (1,000 – 114 = 886), its highest pressured gas needed an additional 553 psig (1,000 - 447 = 553).

2.      Recognizing that gas loses wellhead pressure as it travels away from the well (mostly caused by internal friction against the pipeline's inner wall), Ovintiv's engineers designed or contracted for compressor stations in the field to raise pressure throughout the transportation system.   Recognizing the same point, the third-party processor's engineers also designed compressors at the processing plant to raise the pressure before entry into the pipeline.  Both sets of compressors raised the pressure of the gas above 1,000—providing at the least 1,678 and at the most 2,110 in total compression.  In other words, before sale, Ovintiv's gas reached marketable condition twice.

3.      Under the controlling precedent, an Assistant Secretary's decision from 2003— *See Valuation Determination for Coalbed Methane Production from the Kitty, Spotted Horse, and Rough Draw Fields, Powder River Basin, Wyoming* (Oct. 9, 2003) ("Devon VDL")—Ovintiv needed to place gas in marketable condition only once, not twice.  Furthermore, where (as in the Devon VDL and here) gas was placed in marketable condition twice, the lessee can choose whether to deduct the cost of the first set or the second set of compressors.

4.      Here, the administrative decisions were faithless to the Devon VDL, holding that

ONRR could adopt a "bright-line rule" depriving the lessee of the choice allowed by the Assistant Secretary and denying Ovintiv any deduction for the costs of both sets of compression. The Department reasoned that Ovintiv could not take any deductions before the first time the gas reached marketable condition (thus purportedly eliminating Ovintiv's field compression) and that it could not deduct the compression at the plant because plant compression is non-deductible "boosting."

5.    Recognizing it was disregarding the precedent, ONRR felt compelled to treat the Devon VDL as overruled. It argued the Departmental rulings in *Amoco Production Co.*, MMS-97-0155-O&G and *ARCO/Vastar*, MMS-97-0063-O&G and MMS-97-0191-O&G had superseded the Devon VDL. In response, Ovintiv showed the Devon VDL was the latest of those three rulings, and earlier rulings cannot supersede later ones.

6.    Before the Interior Board of Land Appeals ("Board"), ONRR wisely abandoned the argument that the Devon VDL was superseded. ONRR then urged that the Devon VDL was not binding and that ONRR can apply the marketable condition rule as it pleases. But, as Ovintiv showed, the Devon VDL <u>does</u> bind ONRR: the regulations say so. Its effect as precedent is just like a decision of the Board: its binding force is juridically limited to the parties before the Board,[1] but the Board's reasoning becomes precedential and may not be deviated from absent sound explanation.

---

[1] "The Board applies the doctrines of res judicata and collateral estoppel in its proceedings." *Stull Ranches, LLC*, 194 IBLA 1, 10 (2018). A party before the Board can be bound by judgments in prior proceedings to which it was a party, but a non-party cannot be bound. *Id.* at 12 (BLM not bound by judgment in prior case to which it was not a party). By way of illustration, Ovintiv is not bound by this Board's decision in *Stull Ranches*, but BLM is; and the Board itself would be required to follow its own reasoning in a future similar case, unless the Board overruled the *Stull Ranches* decision.

7.      Finally, throughout the administrative appeal, ONRR repeatedly relied on facts—or ONRR's assertion of the lack thereof—that Ovintiv had demonstrated to be contrary to the record.  ONRR complained as late as 2022, for example, that Ovintiv failed to "identify how many wells exist in the Anderson Gulch production area[.]"  The record shows the answer is "two."  This material can easily be found in Ovintiv's submission from 2017, which was even cited by ONRR in the administrative appeal, but inexplicably omitted from the administrative record, and again submitted by Ovintiv before the Board.

8.      Despite Ovintiv highlighting the relevant factual material throughout the administrative appeal, ONRR largely relied on a cut-and-paste methodology in response. The Board has repeatedly held that "[w]hen an appellant repeats arguments already considered by the decisionmaker below, as if there were no decision addressing those arguments, the repetition constitutes mere disagreement with the decisionmaker and cannot establish error" in the decision. *Wallace Forest Conservation Area Advisory Committee*, 192 IBLA 108, 112 (2017) (citing precedents).  Here the shoe is on the other foot.  Ovintiv gave specified rebuttals to points raised by ONRR, but ONRR merely cut and pasted its previous rationale without addressing the rebuttals. When an agency fails to respond to significant arguments, its decision is arbitrary.  "It is well established that the [agency] must 'respond meaningfully to the arguments raised before it.'" *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015) (quoting *Pub. Serv. Comm'n v. FERC*, 397 F.3d 1004, 1008 (D.C. Cir. 2005)).

9.      In deciding this administrative appeal, the Department violated the Administrative Procedure Act as its actions are contrary to law, arbitrary and capricious, and unsupported by the record. Furthermore, the Department violated Ovintiv's due process rights as the Department ruled against Ovintiv, in part, based on Ovintiv's inability to obtain third-party documents and

information that the Department knows Ovintiv cannot obtain but that the Department can. This Court should set aside the Department's actions.

## JURISDICTION AND VENUE

10.     Ovintiv challenges the Secretary's decision, dated September 1, 2022 (Case No. IBLA-2022-0051) ("Decision"), which formally deemed affirmed ONRR's November 9, 2021 Order in the consolidated administrative cases ONRR-18-0056 and ONRR-19-0109-O&G ("Director Order") because the monetary obligations of the Director Order involve a principal amount of $10,000 or more and the Secretary, though the Board, failed to issue a final decision within the 33-month period under 30 U.S.C. § 1724(h)

11.     The Decision is not subject to further appeal within the agency.  The Decision constitutes the final action of the Department.  *Continental Res., Inc. v. Jewell*, 846 F.3d 1232, 1233-34 (D.C. Cir. 2017).

12.     Ovintiv has suffered legal wrong from and is adversely affected and/or aggrieved by the Director Order and Decision within the meaning of 5 U.S.C. § 702.

13.     This action arises under the APA, the Mineral Leasing Act of 1920 (30 U.S.C. §§ 181, *et seq.*), the Federal Oil and Gas Royalty Management Act of 1982 (30 U.S.C. §§ 1701-1759), as amended by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996 (Pub. L. No. 104-185, 110 Stat. 1700), the federal royalty regulations of ONRR (30 C.F.R. Parts 1200-1299 (2016)), and the Due Process Clause of the Fifth Amendment to the United States Constitution.

14.     This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. §§ 2201-02 (declaratory relief).  An actual controversy exists between the Parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.  By operation of the

APA, Congress has waived the sovereign's immunity from suit.

15.     Venue is proper for Ovintiv's royalty claims under 28 U.S.C. § 1391(e)(1)(A) because the Defendants, federal officers and agencies, reside in this district.  Venue is also proper for Ovintiv's royalty claims under 28 U.S.C. § 1391(e)(1)(B) because a substantial portion of the challenged decision-making occurred in this district.

## PARTIES

16.     Ovintiv is a Delaware corporation with its principal place of business in Denver, Colorado.

17.     Defendant Debra A. Haaland is the Secretary of the Interior ("Secretary") and is sued in her official capacity.

18.     Defendant Department of the Interior ("Department") is a federal executive department of the United States government.

19.     Defendant Howard Cantor is the Acting Director of ONRR and is sued in his official capacity.

## FACTUAL BACKGROUND

20.     Ovintiv is a crude oil and natural gas exploration and production company.

21.     Ovintiv is now (and at all relevant times during 2012, the "Relevant Time Period," was) a lessee under various Department-administered oil and gas leases.

22.     Ovintiv, as the holder of the leases, pays royalties on federal production for all gas removed and sold.

23.     At the time relevant to this case, the calendar year 2012, Ovintiv held numerous federal oil and gas leases in the Piceance Basin of western Colorado. And Ovintiv owned and/or operated various natural gas wells producing from those leases.  The gas production that eventually

flows into the Meeker Gas Processing Plant ("Meeker Plant") originates from eleven areas: Anderson Gulch; Brush Creek; Bullfork; Divide Creek; Mamm Creek; North Parachute; Orchard; Plateau Creek; Rulison; South Parachute; and Story Gulch (each an "Area of Production").

24.    The average wellhead pressure of production from the various Areas of Production ranged from as low as 114 psig to as high as 447 psig.

25.    Ovintiv provided the supporting information underlying the average wellhead pressures for each Area of Production to ONRR throughout the administrative process. The underlying data contains wellhead pressure for each month from 2012-2016. The wellhead pressures are then aggregated by Area of Production to produce a yearly average and, finally, an average for 2012-2016 that is shown in paragraph 24.

26.    During the Relevant Time Period, gas from these Areas of Production was transported to the Meeker Plant via three pipelines (i.e., the Collbran Valley Pipeline, which flows into the Great Divide Pipeline, which flows into the Piceance Creek Pipeline).

27.    To be transported to the Meeker Plant, the gas from the various Areas of Production was compressed via various field compressors located along the transportation system and upstream of the Meeker Plant ("Field Compression") by an average of 782 psig on the low end to 1,119 psig at the high end.

28.    Ovintiv provided to ONRR throughout the administrative process the supporting information underlying the daily pressures for Field Compression received from a third party for Orchard, Rifle, Middle Fork, Bullfork, and Story Gulch. And Ovintiv also included with its Statement of Reasons to the Board the daily average pressures for compressors owned by Ovintiv for the Middle Fork, Story Gulch, Bullfork Check Meter, K24, and D36 Pads. These data and others were used to derive the averages in paragraph 27.

29.     Inside the Meeker Plant, gas from the various Areas of Production was compressed on average as follows:  first, at a Booster Compressor from 335 psig up to 418 psig; and second, at a Residue Compressor from 418 psig up to 1,231 psig.  That is, the pressure of the gas was increased on average by 896 psig inside the Meeker Plant.

30.     The Meeker Plant is a cryogenic gas processing plant operated by a third party that provides *inter alia* processing services, treatment for carbon dioxide removal, compression, and natural gas liquids handling and storage. A significant part of the cryogenic process is causing the pressure of the gas stream to decrease significantly so that the gas cools, enabling natural gas liquids to drop out of the gas stream.  Because dropping the pressure is essential to the operation of the processing plant, the residue gas must be compressed again.

31.     During the Relevant Time Period and after processing at the Plant, the residue gas was transported to sales points via two interstate pipelines—the Northwest Pipeline or the White River Hub Pipeline.  Most of Ovintiv's residue gas flowed through the White River Hub Pipeline, which connects to the Rockies Express Pipeline and the Trans Colorado Pipeline.

32.     For the Relevant Time Period, ONRR determined the marketable condition pressure for gas from all Areas of Production to be "the delivery pressure to enter the White River Hub from the Meeker Gas Plant, which is 1,000 pound-force per square inch gauge (psig)." In other words, Ovintiv provided at the least 1,678 and at the most 2,110 in total compression—clearly in excess of that required to meet marketable condition.

**PROCEDURAL HISTORY**

<u>OVINTIV'S UNBUNDLING METHODOLOGY</u>

33.     On July 12, 2016, ONRR began a compliance review and audit of Ovintiv's federal royalty obligations during calendar year 2012 for natural gas produced from various federal leases located within the State of Colorado (the "Audit").

34.     During that Audit, on May 12, 2017, Ovintiv submitted a comprehensive unbundling methodology to ONRR for review and approval (the "Unbundling Methodology"). That methodology reflected various transportation costs that when allocated across all relevant products (i.e., processed (residue) gas, gas plant products, and fuel gas) exceeded the 50% federal transportation allowance limitation.

35.     By the end of 2017, however, ONRR had not completed its Audit or its review of the Unbundling Methodology.

<u>OVINTIV'S REQUEST TO EXCEED</u>

36.     On January 29, 2018, Ovintiv submitted its Request to Exceed to ONRR, requesting the agency allow Ovintiv to exceed the 50% transportation allowance limitation for certain federal natural gas production from various leases in the Piceance Basin of western Colorado transported through and processed at the Meeker Plant during the Relevant Time Period.

37.     In the Request to Exceed, Ovintiv provided ONRR with various supporting information and documentation, including *inter alia* its Unbundling Methodology, contracts, schematics, sample monthly calculation spreadsheets, and a completed ONRR Form-4393. Ovintiv made its personnel available to ONRR if the agency had any questions.

## ONRR'S DENIAL OF OVINTIV'S REQUEST TO EXCEED

38.     By March 2018, ONRR had still not yet completed its Audit or its review of the Unbundling Methodology.  Nevertheless, on March 28, 2018, Mr. John Barder, Program Manager for Royalty Valuation of ONRR, denied Ovintiv's Request to Exceed on behalf of ONRR ("Denial").

39.     In the Denial, ONRR recognized that a lessee's transportation deduction may exceed 50% of the value of the royalty-bearing product(s) (e.g., processed (residue) gas, gas plant products, field fuel gas, etc.) if the lessee timely submits a request to exceed the transportation allowance limitation and the lessee demonstrates the transportation costs incurred in excess of the limitation are "reasonable, actual, and necessary costs."

40.     In this case, ONRR denied Ovintiv's Request to Exceed because the agency claimed it included disallowed costs of compression to place the gas into marketable condition incurred along the transportation pipeline system upstream of the Meeker Plant:

> Because ONRR contends that [Ovintiv]'s unbundling calculations include disallowed costs, specifically disallowed costs of compression to place the gas into marketable condition, ONRR denies your request. . . . [Ovintiv] is deducting costs incurred along the pipeline system prior to the gas plant for compression below 1,000 psig.  These costs are not allowable under ONRR's regulations.  . . .  Evaluation of [Ovintiv]'s unbundling method – as part of both the ongoing Compliance Review and analysis provided by Royalty Valuation – indicates that [Ovintiv]'s calculated transportation costs include disallowed costs of compression to place the gas into marketable condition.  For this reason, [Ovintiv]'s request to exceed the 50-percent transportation limit is denied.

41.     ONRR did not claim these compressions costs were unnecessary, unreasonable, or not "actual."  Nor did it dispute Ovintiv's timely submission of its Request to Exceed.

42.     The Denial was limited to compression costs incurred "along the pipeline system prior to the gas plant[.]"  ONRR did not dispute any other costs included in Ovintiv's Request to Exceed.

OVINTIV'S APPEAL AND REQUEST FOR CLARIFICATION

43.     Aside from the quotation provided above in paragraph 40, ONRR did not otherwise identify which compression costs were disallowed or otherwise explain the methodology or reasoning behind denying deduction of such compression costs.

44.     On April 26, 2018, Ovintiv timely submitted a Notice of Appeal of the Denial to the Director of ONRR.  Because ONRR provided only a limited explanation for denying Ovintiv's Request to Exceed, in its Notice of Appeal, Ovintiv requested the Director rescind or clarify the Denial because (i) ONRR had not provided Ovintiv with an explanation of the Denial and (ii) ONRR had not specifically identified which compression costs were disallowed.

OVINTIV'S REFUND REQUEST

45.     On January 31, 2019, Ovintiv also submitted to ONRR a Request for Refund based on the results of its Unbundling Methodology.  On May 31, 2019, ONRR denied the Request for Refund. Ovintiv appealed this decision as well.

THE DIRECTOR'S ORDER AND DENIAL OF OVINTIV'S REQUEST TO EXCEED AND REQUEST FOR REFUND

46.     On November 9, 2021, the Director of ONRR issued a consolidated decision on both Ovintiv's administrative appeals of the denials of the Request to Exceed and Request for Refund. In the Director Order, ONRR denied Ovintiv's Request to Exceed and, because if that request failed no refund is due, rejected second the Request for Refund.

OVINTIV'S APPEAL TO THE BOARD AND DEEMED AFFIRMANCE

47.     On December 10, 2021, Ovintiv appealed the Director Order to the Board.

48.     After Ovintiv's administrative appeal to the Board was fully briefed, the 33-month deadline for the Department to decide Ovintiv's royalty appeal expired.

49.     Due to failure of the Board to issue a decision within the 33-month period under 30 U.S.C. § 1724(h), the Secretary was deemed to have issued and granted a decision: (a) in favor of Ovintiv as to (i) nonmonetary obligation(s) asserted in the Director Order and (ii) monetary obligation(s) asserted in the Director Order, the principal amount of which was less than $10,000; and (b) in favor of the Secretary as to monetary obligation(s) asserted in the Director Order, the principal amount of which was $10,000 or more.

50.     As deemed affirmed by the Decision, the Director Order affirmed both ONRR's denials of Ovintiv's Request to Exceed and the Request for Refund.

51.     On September 1, 2022, the Board issued the Decision, providing notice to the parties that the 33-month deadline had expired and the Department had lost jurisdiction over Ovintiv's administrative appeal.

52.     Ovintiv challenges the Decision, which upheld the Director Order as to monetary obligation(s) asserted in the Order, the principal amount of which was $10,000 or more.  The Department may rely only on the rationale it gave in the Director Order.  *Clean Air Council v. Pruitt*, 862 F.3d 1, 11 (D.C. Cir. 2017).

### GOVERNING STATUTORY AND REGULATORY PROVISIONS

53.     Under the Mineral Leasing Act of 1920 (30 U.S.C. §§ 181, *et seq.*), the Department issues and administers gas leases on federal lands. Under such leases, private companies sell gas production directly, and the government charges the lessee royalties based on the "value of the production" removed or sold from the leased lands. 30 U.S.C. § 226(b)(1)(A).

54.     Federal regulations require ONRR to allow lessees to deduct transportation costs from the royalty value of natural gas production:

> . . .  ONRR shall allow a deduction for the reasonable actual costs incurred by the
> lessee to transport unprocessed gas, residue gas, and gas plant products from a lease
> to a point off the lease, including, if appropriate, transportation from the lease to a
> gas processing plant off the lease and from the plant to a point away from the plant.

30 C.F.R. § 1206.156(a).

55.     Where a lessee's transportation costs exceed 50% of the royalty value of production, ONRR will allow the lessee to deduct such costs upon request, provided the transportation costs are "reasonable, actual, and necessary" and do not "reduce the value for royalty purposes under any sales type code . . . to zero." *Id.* § 1206.156(c)(2)-(3).

56.     Federal regulations also require lessees to place production in "marketable condition" at no cost to the federal government:

> The lessee must place residue gas and gas plant products in
> marketable condition and market the gas for the mutual benefit of
> the lessee and the lessor at no cost to the Federal Government.  . . .

*Id.* § 1206.153(i).

57.     "Marketable condition" means "lease products which are sufficiently free from impurities and otherwise in a condition that they will be accepted by a purchaser under a sales contract typical for the field or area." *Id.* § 1206.151.  Costs incurred for services necessary to place production in "marketable condition" are not deductible.  *See id.* § 1206.157(g)(8).

58.     "Compression" is "the process of raising the pressure of gas." *Id.* § 1206.151. Compression is a type of service that may be necessary to place production in "marketable condition." *See*, *e.g.*, *Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1036-1037 (D.C. Cir. 2008).  However, where compression is "required for transportation" and "exceeds the services necessary to place production into marketable condition," ONRR is required to allow lessees to

deduct the costs of such "supplemental compression" from the royalty value of their production. 30 C.F.R. § 1206.157(f)(9).

## DEFENDANTS' VIOLATIONS OF LAW

### ONRR INCORRECTLY REJECTED BINDING DEPARTMENT PRECEDENT.

59.     ONRR attempts to draw a bright-line rule that marketable condition can only be met in a linear fashion. According to ONRR in this appeal, transportation allowances for compression can only be taken for compressors along the line *after* the marketable condition pressure is met. But that interpretation runs directly afoul of the Assistant Secretary's guidance that allowed an operator to elect allowances for two compression stages along that line. *See* Devon VDL. In other words, when confronted with four stages of compression, the Assistant Secretary allowed the operator to claim allowances for either the third or the fourth stage but not both. The Devon VDL is binding precedent for ONRR. *See Fina Oil &Chemical Co. v. Norton*, 332 F.3d 672, 675 (D.C. Cir. 2003) (citing *Blue Star, Inc.*, 41 IBLA 333 (1979) (Assistant Secretary decisions are binding precedent within the Department)).

60.     The Devon VDL provides the underlying methodology.  The Assistant Secretary held that "in general, [a lessee is] not required to condition the production to meet the marketable condition requirement more than once" and "[a lessee is] not required to keep the gas at the pressure needed to be in marketable condition throughout the process until it is delivered to the purchaser, where . . . the gas loses pressure as it moves downstream."  Although lessees must compress their gas production to a pressure sufficient to enter the relevant pipeline(s), lessees may choose where and how many phases or steps are necessary to do so:

> From the earliest precedents in *The Texas Co.* and *The California Co.*, continuing through the 1988 rules and the discussion in the preamble, and through the most recent decisions, the principle that the lessee must compress the gas to a pressure

sufficient to enter the relevant pipeline has been uniformly upheld in both Departmental and judicial decisions.  Where – and in how many phases or steps – [a lessee] chooses to compress the gas to the necessary pressure is up to [the lessee]. But regardless of the physical processes or particular engineering scheme it finds to be most suitable, the costs of compression to the relevant pipeline pressure are not deductible.

61.     The ultimate decision in the Devon VDL involved a complex factual analysis of the particular lessee's transportation, compression, and pipeline system, but the methodology to determine which compression costs were deductible is straightforward.  First, the marketable condition requirement must be determined—there, except as to certain gas sold elsewhere, the lessee was required to compress its natural gas up to 1,100 psi.  Second, the compressors must be identified.  From wellhead to sale, the lessee's production was compressed by rotary screw compressors (located near the wellsite), reciprocating compressors (located in the field), another large compressor (also located in the field and referred to as the "MTG Booster"), and a plant compressor (located at the outlet of the facility).

62.     Third and finally, deductibility is determined.  After recognizing the wellhead pressure, calculating the amount of compression (or pressure increase) provided by each compressor, and comparing the total amount of compression to what was required to reach marketable condition, the Assistant Secretary determined that the relevant lessee could deduct the costs of the MTG Booster (located in the field) but could not deduct the costs of other compression. The following chart provides illustration:

| Devon VDL—Compression Necessary to Reach Marketable Condition: | | | |
|---|---|---|---|
| Marketable Condition | 1,100 psi | | |
|  - Wellhead Pressure | 2 psi | | |
| = Necessary Compression | **1,098 psi** | | |
| | | | |
| **Lessee's Compression:** | | | **Deductible?** |
| Rotary Screw Compressors | From 2 psi to 100 psi | 98 psi | No |
| Reciprocating Compressors | From 100 psi to 800 psi | + 700 psi | No |
| Plant Compression | From 800 psi to 1,100 psi | + 300 psi | No |
| | | **= 1,098 psi** | |
| | | | |
| MTG Booster | From 450 to 1,200 psi | 750 psi | Yes |

63.     Notably, the Assistant Secretary's methodology for determining deductible compression costs included the compression provided within the plant as a "phase or step" of compression provided by the lessee to reach marketable condition.  As a result, even though production had only been compressed by 798 psi when it reached the MTG Booster (i.e., from 2 psi to 100 psi at the rotary screw compressors and then from 100 psi to 800 psi at the reciprocating compressors)—which was less than the 1,098 psi required to reach marketable condition—and was only at a pressure of 450 psi (due to loss of pressure along the transportation system) when it reached the MTG Booster—which was less than the 1,100 psi marketable condition pressure—the costs of the MTG Booster were properly deductible.

64.     But another step in the Devon VDL analysis must not be overlooked. In concluding the lessee could deduct the MTG Booster, the Assistant Secretary supported her analysis of that particular system by analogizing to a hypothetical scenario where the plant was located "near the field" and the MTG Booster had not existed.  In that hypothetical, the gas would have traveled through the screw and reciprocating compressors and directly entered the plant.  All three stages of that compression would have been necessary to reach the pressure for marketable condition and,

therefore, would have been non-deductible. Because the plant was not near the field, however, the MTG Booster was necessary for transportation and properly deductible.

65.     In sum, the Devon VDL found that lessees are *not* required to compress production up to marketable condition *first* before deducting compression costs.  Rather, the total amount of compression provided by the lessee is calculated first before determining which of the various compression steps or phases, if any, are necessary to reach marketable condition pressure.

66.     Under the specific statutory and regulatory scheme here—and others governing the Department—Assistant Secretary decisions are binding on the Department and its subordinate bureaus. *Fina Oil & Chemical Co.*, 332 F.3d at 675; *see also Cherokee Nation v. Bernhardt*, 936 F.3d 1142, 1148-50 & n.4 (10th Cir. 2019) (recognizing the binding nature of Assistant Secretary decisions on the Bureau of Indian Affairs related to trust lands applications).  While valuation determinations are not regulations, they are specifically binding on ONRR until rescinded or superseded by a new statute or regulation: "A determination that the Assistant Secretary for Policy, Management and Budget signs *is binding on both you and ONRR* until the Assistant Secretary modifies or rescinds it." 30 C.F.R. § 1206.148(c)(1) (2016) (emphasis added); *see also id.* § 1206.148(f). The regulation explicitly says it is binding on ONRR and case law affirms that Assistant Secretary decisions bind the Department.  *See, e.g., IPAA v. Babbitt*, 92 F.3d 1248, 1256-57 (D.C. Cir. 1996) (nothing in Interior's procedures gives a bureau director power to "issue proclamations binding on the agency," but an Assistant Secretary's decision was binding).  The Devon VDL provides a template and methodology for other lessees to follow because the Assistant Secretary has approved it.  That is exactly what Ovintiv did here.

67.     The Devon VDL further provides the appropriate methodology for Ovintiv as ONRR has applied the Devon VDL to other gas producers. *See, e.g., Devon Energy Corp. v.*

*Norton*, No. 04-CV-0821 (GK), 2007 WL 2422005, at *7 (D.D.C. Aug. 23, 2007), *aff'd* 551 F.3d

1030 (D.C. Cir. 2008) ("Devon acknowledges that Interior has already begun to apply the 2003

decision [the Devon VDL] to other gas producers."); *Devon Energy, et al.*, 171 IBLA 43, 45-46

(2007) ("Interior argued that Devon is <u>not</u> the only lessee required to comply with the instructions

[from the Devon VDL], specifically stating the [Dear Reporter Letter] shows that the Department

intends to apply the interpretations contained in that letter to coalbed methane producers generally

. . . .").

     68.    In its Unbundling Methodology, as updated during its administrative appeal before

the Department, Ovintiv followed the methodology laid out by the Assistant Secretary in the

Devon VDL—which is binding precedent for the Department.   Specifically, through both

compression provided first in the field and then at the processing plant Ovintiv provided nearly

twice the total pressure necessary to compress the gas to marketable condition. As allowed by the

Devon VDL, Ovintiv elected to claim an allowance for the first stage—Field Compression—and

not the plant compression. However, ONRR illegally departed from this precedent in rejecting

Ovintiv's Request to Exceed and Request for a Refund through the Director Order and announcing

a new bright-line rule that federal lessees must compress gas to marketable condition first before

deducting compression costs.

     69.    Indeed, under ONRR's rationale during the administrative appeal, Ovintiv was

required to provide even less compression than previously believed—only 1,000 psi to reach

marketable condition. Before its administrative appeal to the Director of ONRR, Ovintiv

readjusted its marketable condition analysis to account for ONRR's lowered marketable condition

requirement. That adjustment allowed Ovintiv to claim a transportation allowance for a portion of

the plant compression as well, which Ovintiv highlighted was allowable because the compression

was in excess of what was necessary to reach marketable condition and properly deductible under 30 C.F.R. § 1206.156(a). Inexplicably, the Director of ONRR denied those adjusted transportation costs for a portion of the plant compression as well, claiming they were unallowable under 30 C.F.R. s 1202.151(b) as "boosting."

70.     Before the Director of ONRR, Ovintiv also submitted an alternative proposal in response to ONRR's new supposed bright-line rule that marketable condition must be met in a linear fashion.   Under Ovintiv's alternative theory, Ovintiv calculated the portion of field compression necessary to reach marketable condition pressure in a linear fashion. As marketable condition was reached in the field before the plant compression, Ovintiv sought a transportation allowance for only the portion of its field compression in excess of the marketable condition requirement and for all of the plant compression. Because the gas from each Area of Production reached marketable condition for pressure prior to entering the plant, all additional compression provided within the plant to transport the residue gas to sales points was properly deductible.  *See* 30 C.F.R. § 1206.157(f)(9).   The plant compression is located near the tailgate end (i.e., post-processing) and served to compress the residue gas for transportation to sale via the relevant tailgate pipelines—the Northwest Pipeline or the White River Hub Pipeline.  Because these plant excess compression costs were incurred to transport the residue gas from the plant to sale, they are properly deductible.  *See id.* § 1206.156(a).

## ONRR ARBITRARILY AND CAPRICIOUSLY REJECTED OVINTIV'S UNBUNDLING METHODOLOGY FOR QUIBBLES WITH THE DATA SUBMITTED.

71.     In denying the administrative appeal, the Director claimed Ovintiv must provide the "actual inlet and outlet pressures of each compressor station for each month it requests," relying on a September 11, 2019 decision from the United States Federal District Court for the District of

Wyoming. Director Decision at 13-14 (citing *Devon Energy Prod. Co. v. Gould*, 421 F. Supp. 3d 1213, 1237-39 (D. Wyo. 2019)).  ONRR's reliance on *Devon Energy Production* is misplaced. As an initial matter, the court decided the case on *September 11, 2019*. That is over two years after Ovintiv submitted its Unbundling Methodology on May 12, 2017.  Nearly 18 months after ONRR issued the Denial of the Refund Request on March 28, 2018. And almost six months after Ovintiv filed its Statement of Reasons to the Director of ONRR on April 26, 2019.  It is hard to imagine how Ovintiv could have been charged with notice that ONRR requires monthly data for every compressor when the decision upon which the Director Order relies was issued almost six months after all the relevant data and briefing in this appeal was submitted to ONRR and the Director.

72.     Furthermore, the Director Order's monthly requirement contradicts ONRR's own guidance.  In its Unbundling Cost Allocations, ONRR itself publishes *yearly*—not monthly—allowed and disallowed costs for some of the most prominent gas transportation and processing systems.  As a specific example, ONRR's Unbundling Cost Allocation for the Meeker Plant is done on a yearly basis.  It is arbitrary to require lessees to submit monthly data when ONRR itself endorses yearly averages.

73.     Returning to *Devon Energy Production*, that case is both legally and factually distinguishable.  Before the court were two ONRR orders to report and pay additional royalties. *Devon Energy Prod.*, 421 F. Supp. at 1218-20. The court made two legal holdings. First, it vacated the earlier order because it failed the statutory requirements for an appropriate order. *Id.* 1225-26. Second, it upheld the second order as a proper order under the statute but remanded the second order to ONRR for additional consideration of evidence in the record. *Id.* at 1226-28. Only after making the core legal holdings, did the court address evidence submitted by Devon. *Id.* at 1235-

39. As the "monthly" comments were not part of the court's holdings, the comments are dicta and not binding on the agency or other courts.

74.     Furthermore, the facts in *Devon Energy Production* are different. Devon had claimed transportation deductions for treating, dehydrating, and compressing gas. In support, it had submitted average specifications for its gas that were on their face not in marketable condition. *Id.* at 1236-39 (comparing Devon's averages to marketable condition requirements). From that comparison, the court stated: "Put plainly, on average Devon's gas was unmarketable." *Id.* at 1238. That is not the case here. It is undisputed that Ovintiv provided more supplemental compression than necessary to reach the marketable condition pressure requirement. It is not a close call to compare averages like in *Devon Energy Production*. And ONRR has provided no justification for why the yearly average pressures Ovintiv submitted are inaccurate.

75.     What is more, ONRR's position further wilts in the face of the data that Ovintiv submitted to it. Ovintiv provided the monthly wellhead pressure for each well at issue. Ovintiv provided the daily pressures for Ovintiv-owned compression and third-party compression at multiple compressor stations. And it provided the yearly averages, all without dispute, in excess of the pressure required to meet the pipeline specifications.

76.     For some third-party information, Ovintiv was forced to use data from a different period—but that third party confirmed that the data was indicative of the actual pressures during the Relevant Time Period. As ONRR well knows, Ovintiv cannot compel third parties to provide this information—but ONRR can. ONRR has not stated anywhere in the administrative appeal that this information is inaccurate or an unreliable estimate of those third-party costs. And ONRR has explicitly endorsed the use of estimated information when the actual costs are unknown to approve unbundling methodologies. As ONRR represented to the federal court, and the court adopted:

ONRR routinely approves methodologies developed by lessees without access to third-party financial information. Some ONRR-approved methodologies are based on engineering reports specific to the system in question. Others use modeling systems or cost-estimating software to estimate the cost of each piece of equipment and service within the bundled fee. Some rely upon installation quotes, published papers, studies and other educational resources to approximate the cost of equipment and separate the bundled fee into allowable and non-allowable costs. Others develop an unbundling methodology based exclusively on the terms of the contract and publicly available marketable condition information.

*Devon Energy Prod.*, 421 F. Supp. 3d at 1239 (quoting ONRR's briefing to the court).

77.     While ONRR represented it approves such estimated and reverse-engineered methodologies elsewhere, the Director Order requires actual, monthly, and proprietary information from third parties without giving any explanation of why Ovintiv's data is inaccurate or insufficient. Simply put, Ovintiv submitted a comprehensive 41-page Unbundling Methodology supported by 13 separate exhibit categories that contained dozens of source documents. Rather than identify any inaccuracies in the data or adhere to its representations to a federal court, the Director Order dispenses in its entirety of Ovintiv's Request to Exceed based on unexplained—and arguably pretextual—and unsubstantiated deficiencies in the supporting data.

78.     An examination of the information before the Department further disproves the supposed factual quibbles ONRR raised during the administrative appeal. At best, ONRR simply did not analyze the information. At worst, it mischaracterized and misconstrued what was before it. Either way, ONRR's alleged factual reasons for denying Ovintiv's Request to Exceed and Request for Refund are arbitrary and capricious and without basis in the factual record before the agency.

79.     For example, ONRR's administrative record and supplemental administrative record submitted to the Board did not contain a single spreadsheet. The heart of this appeal is Ovintiv's Unbundling Methodology. Ovintiv submitted much of the supporting data in

spreadsheets, which it transmitted to ONRR in conjunction with the Unbundling Methodology on May 17, 2017 and on April 26, 2019 in support of its briefing before the Director of ONRR. *Dugan Prod. Corp.*, 103 IBLA 362, 363 (1988) ("MMS is reminded of its obligation to submit the complete, original administrative record to this Board, *including all original documentation involved in the matter*." (emphasis added)). What its more, the Director cited some of this data in the Director Order. Yet none of this information was in the administrative record and supplement submitted by ONRR to the Board. "Absent a record supporting the agency's factual determinations, the Board cannot sustain a finding applying the relevant law." *Dugan Prod. Corp.*, 103 IBLA 362, 363 (1988) (reversing ONRR's predecessor agency for failing to provide an adequate record for a lessee's late payment).

80.     But the Department's administrative record failings become more important when compared with ONRR's assertions related to the information that is supposedly missing. First, ONRR claims: "Even now, more than five years from ONRR's initial request for Ovintiv's unbundling methodology, Ovintiv has failed to identify or verify whether the Anderson Gulch system has a single well, dozens of wells, or hundreds of wells." Contrary to ONRR's assertion, Ovintiv provided just this information from the outset. Exhibit J to Ovintiv's Unbundling Methodology contained a spreadsheet entitled "Wellhead Pressure"—even the Director Order acknowledged Ovintiv submitted the file. But ONRR apparently ignored it. The very first tab of that spreadsheet, titled "Summary by Area," provided the supposedly missing information for each of the Areas of Production, specifically listing the number of wells in each Area of Production. The second tab of the spreadsheet, titled "Summary by Well," further provided information on the wells within Anderson Gulch and the other Areas of Production. And the subsequent tabs provide the actual wellhead pressure for each well from each Area of Production for each month from 2012

to 2016. ONRR asserted "[t]hose specifics where never provided in an itemized manner by Ovintiv." ONRR's contention is false

81.     As another example, ONRR claimed it could not determine "whether the wellhead pressure identified in the IBLA SOR for each area is an aggregate pressure." ONRR needed to simply look at the "Wellhead Pressure" (Exhibit J to the Unbundling Methodology) spreadsheet provided to it. Ovintiv provided the pressures for each well for each month from 2012 to 2016. Ovintiv sorted those wells to their applicable Areas of Production. It then provided yearly averages from 2012 to 2016 for each Area of Production. And finally provided an average wellhead pressure for each Area of Production. Ovintiv explicitly stated this before the Board: "The data contains wellhead pressure for each month from 2012-2016. *The wellhead pressures are then aggregated by Area of Production to produce a yearly average* and, finally, an average for 2012-2016 that is shown in paragraph 2." (emphasis added). Contrary to ONRR's assertion, Ovintiv provided this granular factual detail and told ONRR the data was aggregated. ONRR just failed to analyze it.

82.     As a third example, ONRR claimed "Ovintiv also failed to identify the amount of compression that took place as the Anderson Gulch production flowed into the Collbran Valley Pipeline." Not only was this information in the Unbundling Methodology Ovintiv submitted to ONRR in 2017, Ovintiv further highlighted it in its briefing before the Board, identifying exactly how much compression was provided for Anderson Gulch production in the field—782 psig. Once again, the exhibits supporting the Unbundling Methodology provided additional information regarding this Field Compression. From the spreadsheet included as Exhibit M to the Unbundling Methodology, the "Meeker Pressures" tab, the Field Compression was provided by Enterprise along the Collbran Valley Pipeline.

83.     Fourth, ONRR asserted "both in the underlying appeal to the ONRR Director and

here, Ovintiv failed to provide evidence of the inlet and outlet pressures of all pre-plant compressor stations." Once again, this assertion is demonstrably false. Ovintiv identified this information in its Unbundling Methodology for both Field Compression and Meeker Plant compression: The supporting spreadsheets further broke down the specific compressors and their inlet and outlet pressures. For example, the following table can be found in the spreadsheet Exhibit K to the Unbundling Methodology under the "Meeker Pressures" tab. And another breakdown can be found in the same spreadsheet under the "Field Compressor Data" tab. This information was aggregated from Ovintiv's and third-party data on the most granular level available—often *daily*. Ovintiv submitted the supporting data, ONRR just had to look at it.

84.     While Ovintiv could continue to disprove the additional factual deficiencies ONRR asserted both before the Director of ONRR and the Board, the point has been made with the four examples above. Furthermore, many of the assertions ONRR made before the Board were found nowhere in the record for the administrative appeal before that point. It is a settled tenet of administrative law that when "reviewing an agency action and the adequacy of an agency's articulation of its action, including findings of fact and reasoning processes, courts must look to the record that was considered by the agency and to the factual findings and reasoning of the agency—not to post hoc rationalizations of counsel." *Dry Color Mfrs. Ass'n v. Dep't of Labor*, 486 F.2d 98 104 n.8 (3rd Cir. 1972). And part of ONRR's complication is that its administrative record and supplement to the Board omitted material Ovintiv submitted to ONRR that contains the information ONRR later claimed was missing.

85.     The Director Order faulted Ovintiv, for "gas compressed by third parties prior to the Meeker Plant," for not providing pressure data for the year 2012.  As Ovintiv explained, Summit Midstream agreed to provide pressure data from later years, but "Summit stated these

pressures are indicative of the operational conditions at the facility" during 2012.  Before the

Director, Ovintiv reminded ONRR that, unlike ONRR which can compel the information from

Summit by subpoena, Ovintiv can only ask Summit.  It was arbitrary for the Director to deny

Ovintiv the deduction when it was impossible for Ovintiv to obtain it.  In response, ONRR merely

copied nearly verbatim the Director Order's discussion, thereby completely failing to respond to

Ovintiv's point.  ONRR has no basis to dispute the information Ovintiv provided, and the Director

Order fails to justify ignoring it.

86.     Finally, the Director Order faulted Ovintiv for not using "the actual compression

[cost] rate to calculate its compression costs[.]"  The Director Order does not explain what it meant

by "actual," but its rationale suggests its complaint applies only to third party compression charges.

> Instead, Ovintiv subtracts what it described as a "dehydration rate" from what it
> describes as a bundled "compression and dehydration rate" by taking the average
> "dehydration rate" from four fields, including two located in the State of Texas.
> Therefore, Ovintiv did not use its actual compression costs[.]

87.     But the record shows the rates were actual Ovintiv rates.  Ovintiv used compression

charges "based on an [Ovintiv] owned facility operating in 2012."  It was based on "rates for third

party compression services . . . along with [Ovintiv] accounting data[.]"  What the Director Order

complains of is how Ovintiv "unbundled" any third-party rate that contained a single charge for

both compression and dehydration.  Ovintiv's assessment of the dehydration component was

"based on a combination of actual gathering charges from third party gathering companies

providing services for [Ovintiv] in Colorado and Texas[.]"  ONRR's conclusion is not reasoned

decision-making.  "[I]t is incumbent upon the administrative adjudicator [at ONRR] to ensure that

the decision is supported by a rational basis, and that such basis is stated in the written decision,

as well as being demonstrated in the administrative record accompanying the decision." *John L.*

*Stenger*, 175 IBLA 266, 279 (2008).  The Director Order erred in calling Ovintiv's costs not "actual" costs and failed to point to any other authority that Ovintiv relied on the costs it used impermissibly.

88.     ONRR is trying to impose filing requirements on Ovintiv that have never been published in the Federal Register in violation of the Administrative Procedure Act.  Agencies are required to publish in the Federal Register, among other things, "rules of procedure . . . and instructions as to the scope and contents of all papers, reports, or examinations[.]"  5 U.S.C. § 552(a)(1)(C).  The Director Order and ONRR's arguments throughout the administrative appeal contain no reference to where instructions on unbundling deductible transportation costs from undeductible other costs may be found in the Federal Register.  ONRR cannot rely on the *ad hoc* quibbles in the Director Order to deny Ovintiv's Request to Exceed.  "Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner . . . be adversely affected by . . . a matter required to be published in the Federal Register and not so published."  5 U.S.C. § 552(a)(1).  *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (striking down a BIA denial of benefits based on requirements for eligibility that had not been published in the Federal Register).

ONRR ILLEGALLY DISALLOWED ALL COSTS OF PLANT COMPRESSION.

89.     The Director Order maintained that "boosting is never allowed" and that a footnote in the Devon DVL, on a point not at issue in that matter, supports that position.  ONRR's problem is that regulation makes it clear boosting can be allowed.  The Director Order quotes the rule:

> A reasonable amount of residue gas shall be allowed royalty free for operation of the processing plant, but no allowance shall be made for boosting residue gas or other expenses incidental to marketing, except as provided in 30 CFR part 1206.

30 C.F.R. § 1201.151(b)(2012).  Having quoted the rule, the Director Order then effectively erased its final clause.

90.     The Board has previously addressed 30 C.F.R. § 202.151(b) in *Encana Oil & Gas (USA), Inc.*, 185 IBLA 133 (2014).   The Board observed "Encana has not shown that its recompression costs are allowable as a [processing] cost of operating the Rifle Plant, or identified a provision in 30 C.F.R. Part 206 that would otherwise authorize an allowance." *Id.* at 147.  Here, in contrast, Ovintiv has identified 30 C.F.R. § 1206.157(f)(9), which authorizes deductions of supplemental costs of compression "if such services are required for transportation and exceed the services necessary to place production into marketable condition[.]"  Ovintiv identified the transportation costs: transport to White River Hub.  The Director Order made no finding that this showing was incorrect, and it is undisputed throughout the administrative appeal.  Instead, the Director Order relied on the categorical "rule" that boosting is never allowed.  That reliance was categorically wrong.

## COUNT I

## <u>VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT<br>AGAINST ALL DEFENDANTS</u>

91.     Ovintiv repeats and re-alleges the allegations in the preceding paragraphs, as if fully set forth herein.

92.     Defendants have violated the APA, 5 U.S.C. § 706(2), because the Director Order and Decision arbitrarily, capriciously, and otherwise unlawfully deny Ovintiv the transportation allowance to which it is entitled under Section 157.  The Department misapplied Sections 156 and 157 under the record here without adequate rationale.

93.     Defendants have additionally violated the APA, 5 U.S.C. § 706(2), because the

Department arbitrarily and capriciously refused to review available evidence supporting Ovintiv's Unbundling Methodology and related materials submitted during the administrative appeal, thereby denying Ovintiv constitutional right, power, and privilege, and acting without observance of procedure by law.

94.     Defendants have additionally violated the APA, 5 U.S.C. § 706(2), because the Director Order and Decision arbitrarily and capriciously depart from Department precedent without adequate explanation.

95.     Defendants have additionally violated the APA, 5 U.S.C. § 706(2), because the Director Order and Decision, inclusive of Defendants' actions during audit and the administrative appeals process, are contrary to constitutional right, power, and privilege—specifically the Due Process Clause of the Fifth Amendment to the United States Constitution.

96.     Defendants have additionally violated the APA, 5 U.S.C. § 706(2), because the Director Order and Decision are unsupported by the record.  ONRR misapplied Sections 156 and 157 based on the record here.

**COUNT II**

**VIOLATIONS OF FITH AMENDMENT DUE PROCESS CLAUSE AGAINST ALL DEFENDANTS**

97.     Ovintiv repeats and re-alleges the allegations of preceding paragraphs, as if fully set forth herein.

98.     The Director Order and Decision violate Ovintiv's rights under the Due Process Clause of the Fifth Amendment to the United States Constitution because the Department purported to require Ovintiv data that the Defendants know Ovintiv cannot access but the Department can. And the Defendants provided no justification for why the data Ovintiv provided

was otherwise contrary to the data Defendants can or have compelled from various third parties.

## PRAYER FOR RELIEF

WHEREFORE, Ovintiv prays the Court:

1.      Grant injunctive relief compelling Defendants to withdraw the Director Order and Decision.

2.      Hold unlawful, reverse, vacate, and/or set aside the Director Order and Decision as: arbitrary, capricious, and abuse of discretion, and/or otherwise not in accordance with law; contrary to constitutional right, power, and/or privilege; excessive of statutory jurisdiction, authority, or limitations, and/or short of statutory right; without observance of procedure required by law; and/or unsupported by substantial evidence.

3.      Enter declaratory judgment that the Director Order and Decision are unlawful and that Defendants unlawfully denied the Request to Exceed;

4.      Enter declaratory judgment that the Director Order and Decision are unlawful and that Defendants unlawfully denied the Request for Refund;

5.      Award Ovintiv costs and attorneys' fees to the extent permitted by law; and

6.      Grant such other relief as may be appropriate in the circumstances.

Respectfully submitted this 10th day of February, 2023.

BAKER & HOSTETLER LLP

*/s/ L. Poe Leggette*
L. Poe Leggette
Bailey Bridges
pleggette@bakerlaw.com
bbridges@bakerlaw.com
811 Main Street, Suite 1100
Houston, TX 77002-6111
Telephone: 713.751.1600
Facsimile: 713.751.1717

Alexander K. Obrecht
aobrecht@bakerlaw.com
1801 California Street, Suite 4400
Denver, CO 80202
Telephone: 303.861.0600
Facsimile: 303.861.7805