**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**OVINTIV USA INC.,**

**Plaintiff,**

**v.**

**DOUG BURGUM, et al.,**

**Defendants.**

**Civil Action No. 23-387 (JDB)**

## MEMORANDUM OPINION

Ovintiv USA Inc., an oil and gas company, leases public land from which it extracts and sells natural gas. Pursuant to federal regulations and the terms of its lease, Ovintiv must pay the government royalties on the value of the gas it produces. In 2018, Ovintiv sought retroactive permission from the Office of Natural Resources Revenue (ONRR) to deduct certain transportation costs from the royalty value of the gas it produced in 2012. It also requested a refund of royalties it alleged that it had overpaid that year. ONRR denied these requests.

Ovintiv now seeks the Court's review of ONRR's denial. Upon careful examination of the parties' filings, the pertinent regulations, and the administrative record, the Court concludes that ONRR's decision largely comported with the APA but was arbitrary insofar as it barred Ovintiv from deducting certain transportation costs on the basis that those costs were incurred before Ovintiv's gas reached marketable pressure.

## BACKGROUND

Understanding the parties' dispute over which transportation costs lessees may deduct from the royalty value of their gas production requires basic familiarity with how gas is extracted, transported, processed, and sold. Our story thus begins at one of the thousands of gas wells on

federal lands, before turning to the regulatory scheme governing this dispute, and then to the particulars of ONRR's denial of Ovintiv's requests.

## I. NATURAL GAS BASICS

To bring gas trapped underground to the surface, producers drill wells on their gas fields. The raw gas extracted from these wells—also known as "wellhead gas"—is often at a low pressure and may contain impurities, generally precluding it from being marketable in its unprocessed form. Geoffrey Heath, Transportation & Processing or Marketability v. Transportation, Hatfields v. McCoys, Liberals v. Conservatives, and Other Well-Settled Controversies, 2004 No. 1 Rocky Mt. Min. L. Found. Inst. Paper No. 10B, 2 (2004) [hereinafter Marketability v. Transportation]. To prepare raw gas for processing and eventual sale, then, lessees "gather" it, combining gas extracted from multiple wellheads by sending it through a network of small-diameter pipelines to a central accumulation point. U.S. DOT Pipeline and Hazardous Materials Safety Admin., Fact Sheet: Gathering Pipelines, https://primis.phmsa.dot.gov/stakeholder-comms/factsheets/fsgatheringpipelines/ [https://perma.cc/QT6B-BUVD] (updated Jan. 12, 2018); see also 30 C.F.R. § 1206.20 (defining gathering).

As raw gas travels towards the central accumulation point, lessees may compress it to maintain its flow. See,e.g., Marathon Oil Co., 149 I.B.L.A. 307, 311 (Jul. 2, 1999). An elementary law of physics provides that gases naturally move from areas of higher pressure to areas of lower pressure. Pl.'s Mot. [ECF No. 28-1] at 5; Gov't Mot. [ECF No. 42] at 5. Untie an inflated balloon and the compressed air inside will rush out; the balloon will not inflate further. The same concept applies to pipelines. Gas will only enter a downstream pipeline if its pressure exceeds the pressure of the gas within that pipeline. Pl.'s Mot. at 5. So to gather wellhead gas, a producer may need to raise its pressure by compressing it. Cf. Heath, Marketability v. Transportation at 16 (explaining

that compression may be necessary "for gas to be produced in the first instance because the system would achieve equilibrium" without it).

Once the raw gas arrives at the central accumulation point, gathering ends. See 30 C.F.R. § 1206.20. Producers then transport the gas through pipelines to a processing plant. Again, compression is often an integral part of this process, especially when the journey is lengthy. Because friction causes gas to lose pressure as it travels through pipes, a producer may need to repeatedly compress its gas to keep it moving towards the processing plant. See Pl.'s Mot. at 5–6; John F. Shepherd, The New Marketable Condition Rule: Is it Really New Or Has it Been this Way?, 2018 No. 5 Rocky Mt. Min. L. Found. Inst., 24 n.39 (2018) [hereinafter The New Marketable Condition Rule].

The schematic below summarizes the prototypical journey natural gas takes from a wellhead to a processing plant, and how producers may compress the gas both prior to the accumulation point, also known as the central delivery point (CDP), and at several places between the CDP and the processing plant.




ONRR, How to Calculate a Transportation UCA, 2 (updated Feb. 20, 2014), https://www.onrr.gov/document/How-to-calculate-a-Transportation-UCA.pdf [https://perma.cc/FPC6-J6XP].

Once inside a processing plant, raw gas is cleansed of impurities, such as water vapor and nonhydrocarbon compounds, and readied for sale. U.S. EIA, Natural Gas Explained, https://www.eia.gov/energyexplained/natural-gas/ [https://perma.cc/MH8F-NWP8] [hereinafter Natural Gas Explained] (last visited Sept. 14, 2026). Plant processing of "wet gas"—which contains natural gas liquids (such as propane and butane), as well as methane (known as "residue gas")—also includes dividing the gas into its constituent parts. Id.; see also Gov't Mot. at 5 n.5. In modern cryogenic processing plants, producers generally accomplish this separation by dropping the pressure of the gas, as "extraction of natural gas liquids is enhanced by achieving a large pressure reduction within the plant." Shepherd, The New Marketable Condition Rule at 19; see also Burlington Res. Oil & Gas Co., 183 I.B.L.A. 333, 354–55 (Apr. 23, 2013).

After the residue gas has been isolated, it is compressed once again through a process known as "boosting." Heath, Marketability v. Transportation at 3; A.R. [ECF No. 55] at 84. Boosting ensures that residue gas is at sufficient pressure to depart the tailgate of the processing plant and enter a "mainline pipeline," which then transports the gas to its ultimate buyer. Shepherd, The New Marketable Condition Rule at 19. For example, if a buyer requires that a producer deliver its gas through an interstate pipeline that contains gas with a pressure of 1000 psig, a producer must boost its residue gas to a pressure greater than 1,000 psig so that the gas may enter the pipeline. Extracted natural gas liquids, meanwhile, are either picked up by trucks or enter a separate liquids pipeline. Id. at 21.

Compression thus serves several different functions in the production, processing, and delivery of natural gas. Heath, Marketability v. Transportation at 2, 18; see also Shepherd, The New Marketable Condition Rule at 6 n.39, 19. At minimum, a producer may compress its gas to (1) gather the gas on its lease, (2) transport the gas beyond the central accumulation point, (3) raise

the pressure of the gas so that it meets buyer specifications, (4) raise the pressure of its wet gas, in particular, so that it may then drop that gas's pressure to cryogenically separate natural gas liquids, and (5) raise the pressure of its residue gas after cryogenic processing so that it can enter a mainline pipeline and reach its ultimate purchaser. With these varied purposes in mind, the Court turns to the regulations governing the computation of federal gas royalties.

## II. REGULATORY FRAMEWORK

The Mineral Leasing Act of 1920 authorizes the Secretary of the Interior to lease certain public lands known or believed to contain oil or gas deposits to energy producers. 30 U.S.C. § 226(a)(1); Udall v. Tallman, 380 U.S. 1, 4 (1965). The Act obligates such lessees to pay royalties to the United States based on the "amount or value of the production removed or sold from [a] lease," 30 U.S.C. § 226(b)(1)(A), and enables the Secretary of the Interior to prescribe rules "necessary and proper" for the administration of lessees' royalty payments, id. §§ 189, 1751. The Secretary must also "audit and reconcile, to the extent practicable, all current and past lease accounts . . . and take appropriate actions to make additional collections or refunds as warranted." Id. § 1711(c)(1).

In 1936, the Interior Department promulgated the "Marketable Condition Rule," addressing how oil and gas removed or sold from a lease must be valued. See Oil and Gas Operating Regulations, 1 Fed. Reg. 1996, 1999 (Nov. 20, 1936). The Rule established that it was "an obligation of the lessee to put into marketable condition all products produced from the leased land and pay royalty thereon, without recourse to the lessor for deductions on account of costs of treatment or of costs of shipping." Id. The Department did not, however, define what processing steps were required to put oil and gas production into "marketable condition," setting off a half-

century-long game of regulatory cat-and-mouse. See Shepherd, The New Marketable Condition Rule at 3–5.

After decades of litigation and administrative disputes concerning who ought to bear the costs for various aspects of processing and transporting natural gas extracted from federal leases, the Interior Department revamped its regulatory framework for calculating oil and gas royalties. Id. at 5. The Department's new rules, promulgated in 1988 and largely unchanged today, retained the lessees' obligation to place the oil and gas they extract in marketable condition "at no cost to the Federal government," 30 C.F.R. § 1206.146, but clarified when oil and gas was "marketable," see Shepherd, The New Marketable Condition Rule at 5.

Under the new rules, lease products are in marketable condition when they "are sufficiently free from impurities and otherwise in a condition that they will be accepted by a purchaser under a sales contract typical for the field or area for Federal oil and gas." 30 C.F.R. § 1206.20; see also Revision of Gas Royalty Valuation Regulations and Related Topics, 53 Fed. Reg. 1230, 1273 (1988) (defining "marketable condition" in a substantially similar way). Hence, when a buyer requires a lessee to deliver its gas via a particular pipeline, the gas is only marketable once it reaches the pressure required to enter that pipeline. Devon Energy Corp. v. Kempthorne, 551 F.3d 1030, 1032 (D.C. Cir. 2008) (affirming the Department's conclusion that "if gas is not sufficiently compressed and dehydrated to be deliverable to the point of purchase through the pipeline, it is not in marketable condition"). This is known as the gas's "marketable pressure."

The 1988 regulations also addressed how the Interior Department would handle oil and gas transportation costs. Although the original text of the Marketable Condition Rule required lessees to bear the cost of shipping the oil and gas they extracted, Oil and Gas Operating Regulations, 1 Fed. Reg. 1996, 1999 (Nov. 20, 1936), beginning in the 1940s, a series of administrative and

judicial decisions authorized lessees to take transportation allowances, see, e.g., United States v. Gen. Petrol. Corp. of Cal., 73 F. Supp. 225, 263 (S.D. Cal. 1946), aff'd sub nom. Cont'l Oil Co. v. United States, 184 F.2d 802 (9th Cir. 1950). The 1988 Regulations codified this longstanding rule. Revision of Gas Royalty Valuation Regulations and Related Topics, 53 Fed. Reg. 1230, 1278–81 (Jan. 15, 1988).

In 2012, the relevant year for Ovintiv's dispute with the government,[1] oil and gas lessees were permitted to deduct from the royalty value of their production:

> the reasonable actual costs incurred by the lessee to transport unprocessed gas, residue gas, and gas plant products from a lease to a point off the lease including, if appropriate, transportation from the lease to a gas processing plant off the lease and from the plant to a point away from the plant.

30 C.F.R. § 1206.156(a) (2012). Lessees could not, however, deduct more than 50% of the value of their production (i.e., residue gas and gas plant products) without seeking permission from ONRR. Id. § 1206.156(c).[2] And to obtain permission to exceed the 50% cap, the regulations required lessees to demonstrate that their transportation costs "were reasonable, actual, and necessary" and submit "all relevant and supporting documentation" to ONRR. Id. § 1206.156(c)(3); see also Marathon Oil Co., 149 I.B.L.A. at 311 (holding that a lessee's inability to delineate allowable from disallowable costs "must operate to the advantage of the Federal Government").

Crucially—in 2012 and today—"supplemental costs for compression" may constitute transportation costs, but only where the deducted compression was "required for transportation

[1] The parties agree that the 2012 version of the regulations control in this case, Gov't Mot. at 3; Pl.'s Mot. at 3, so where the regulations have since been amended or recodified in a new location, the Court cites to the 2012 version.

[2] Today, the regulations impose a hard 50% cap on transportation allowances—no exemptions are permitted. Am. Petroleum Inst. v. DOI, 81 F.4th 1048, 1064 (10th Cir. 2023); 30 C.F.R. § 1206.152(e)(1).

and exceed[ed] the services necessary to place production into marketable condition." 30 C.F.R. § 1206.157(f)(9) (2012); 30 C.F.R. § 1206.153(b)(9). In other words, compression costs "incidental to marketing," such as boosting residue gas, may not be deducted from the royalty value of a lessee's production unless another regulation expressly provides otherwise. 30 C.F.R § 1202.151(b);[3] see also 30 C.F.R. § 1206.153(i) (2012). The costs of gathering raw gas, too, must be borne by lessees, not the federal government. See Cal. Co. v. Udall, 296 F.2d 384, 387 (D.C. Cir. 1961); Burlington Res. Oil & Gas Co., 183 I.B.L.A. at 338–39. But the costs of the compression required to move gas to a plant off the lease, from a post-central accumulation point on the lease, for example, may be deducted. Burlington Res. Oil & Gas Co., 183 I.B.L.A. at 338.

Taking these rules together, lessees may reduce the royalty value of their gas by certain compression costs, provided five things are true: (1) the compression was required to transport unprocessed gas, residue gas, or gas plant products from a lease to a point off the lease, or from the processing plant to a point away from the plant, (2) the purpose of the compression was not to gather gas on the lease nor to "boost" residue gas, (3) the compression costs exceeded those necessary to place the gas in marketable condition, (4) the compression costs were the lessee's actual costs, and (5) those costs were reasonable. Whether Ovintiv's refund request established each of these elements makes up the core of this case.

## III. OVINTIV'S DISPUTE WITH ONRR

Ovintiv leases and operates thousands of gas wells in Colorado, distributed across roughly a dozen fields. See Gov't Mot. at 6; see also A.R. at 72. Gas obtained from these fields travels through a complex network of pipelines and treatment stations to eventually reach a third-party

---

[3] In full, ONRR's prohibition on deducting boosting compression costs reads: "A reasonable amount of residue gas shall be allowed royalty free for operation of the processing plant, but no allowance shall be made for boosting residue gas or other expenses incidental to marketing, except as provided in 30 CFR part 1206." 30 C.F.R. § 1202.151(b).

processing plant, known as the Meeker Plant. A.R. at 72. For several of Ovintiv's fields, it operates the pipelines and stations along the way to the Meeker Plant (the "Ovintiv-Serviced Fields" or "Self-Serviced Fields"); while for other fields, Ovintiv relies on third-parties (the "Third-Party Serviced Fields"). See A.R. at 72, 82; Gov't Mot. at 6.

As Ovintiv's gas travels from wellhead to processing plant, a journey which can span up to 100 miles through mountainous terrain, it is compressed by "field compressors." Pl.'s Sealed Mot. [ECF No. 29] at 11–12. For example, in one of Ovintiv's production fields, raw gas is compressed from a well-head pressure of under 500 psig to over 1000 psig. Id. at 11; A.R. at 72–73. Once this gas arrives at the Meeker plant, it is compressed again and treated to remove carbon dioxide and extract natural gas liquids. Id. at 3, 12. The residue gas, now free of impurities and byproducts, is then boosted by a "Residue Compressor" at the tailgate of the Meeker plant, which brings the gas's pressure back up from under 500 psig to over 1000 psig. Id. at 12. Finally, the residue gas exits the plant and enters one of two interstate pipelines that deliver it to its ultimate purchaser. A.R. at 72–73; Pl.'s Sealed Mot. at 12. ONRR has determined that the required pressure to enter these mainline pipelines, and thus for Ovintiv's gas to be marketable, was 1,000 psig in 2012. Pl.'s Sealed Mot. at 12; see also A.R. at 74.

In 2016, ONRR initiated a compliance review of the royalties Ovintiv paid during the 2012 calendar year. A.R. at 73. As part of its audit, ONNR asked Ovintiv to explain how it had determined its transportation allowance and supply supporting documentation for its calculations. Id. When Ovintiv replied with its methodology, ONRR determined that Ovintiv had improperly deducted the costs of boosting compression and other compression required to bring the gas up to marketable pressure. Id. at 73 & n.27. ONRR further found that Ovintiv had failed to use its own,

actual compression costs to calculate its transportation allowance, as required by 30 C.F.R. § 1206.156(a) (2012). Id. at 73–74.

Ovintiv responded to ONRR's findings by opening a new front in its dispute with the Department. Rather than challenging the determinations ONRR made within its audit, Ovintiv filed a separate, retroactive request to exceed the 50% transportation allowance limit for year 2012. Id. at 74–75. Ovintiv also sought a refund of more than 1.5 million dollars in royalties that it alleged that it had overpaid that year. Id. ONRR denied both requests, again concluding that Ovintiv's transportation allowance calculation included disallowed compression costs and was not based on the actual costs Ovintiv had incurred. Id. at 69, 74–75.

Ovintiv appealed the denials of its requests to exceed the 50% cap and for a refund to the Director of ONRR. Id. at 74–75. It contended that under the relevant regulations, a lessee was only required to compress its gas up to marketable pressure once. Id. at 75. So, according to Ovintiv, all compression in excess of the hypothetical amount required to raise its production from wellhead pressure to marketable pressure was deductible as a transportation expense. Id.

Ovintiv thus argued that it should be permitted to simply subtract the wellhead pressure of its gas from the gas's marketable pressure to determine the amount of compression required to place the gas in marketable condition. See Pl.'s Sealed Mot. at 13–14. Then, to determine how much excess compression it could deduct, Ovintiv asserted that it could sum all the compression it applied to its gas after the gas reached a central accumulation point and subtract the hypothetical amount of compression required to make its gas marketable. See id. The resulting figure, Ovintiv claimed, was the excess compression that it could deduct.[4] Id.

[4] Notably, Ovintiv's methodology assumes that compression can only serve one of two purposes—transportation or raising the gas's pressure to a buyer's specifications, that is, placing it in marketable condition. This methodology ignores that compression of wet gas may be attributable to a third purpose—the need to place the gas at a sufficient pressure to conduct cryogenic separation of natural gas liquids.

Lastly, Ovintiv asserted that it could attribute this excess compression to one of two places in its processing scheme and was therefore permitted to take a transportation allowance for one of two sets of compression costs. See A.R. at 75; Pl.'s Sealed Mot. at 13–14, 16. According to Ovintiv, it could deduct all costs associated with compressing its gas prior to the gas's arrival at the Meeker plant, because the Meeker plant compression satisfied its obligation to place the gas in marketable condition. A.R. at 75; Pl.'s Sealed Mot. at 13. Alternatively, Ovintiv claimed that a portion of the compression it applied to its gas prior to the Meeker plant satisfied its obligation to compress its gas to a marketable pressure, so "it was entitled to claim all Meeker Plant compression and the remaining pre-Meeker plant compression costs in its transportation allowance." A.R. at 75; Pl.'s Sealed Mot. at 13–14, 16.

The Director rejected both of Ovintiv's proposed transportation allowance calculations. To do so, the Director crafted a "bright-line" and "location-based" rule for determining when compression costs could be included in a lessee's transportation allowance. A.R. at 80, 88. Citing the plain text of the Marketable Condition Rule and a nonprecedential Interior Board of Land Appeals (IBLA) decision, the Director found that only compression applied after gas reached the pressure necessary to enter its target mainline pipeline was deductible as a transportation cost. Id. at 80–81 & n.64. All other compression "serve[d] a marketable condition purpose and [was] disallowed." Id. at 80.

---

For example, a hypothetical producer could compress 200 psig wet gas by 1000 psig in the field and then lose 300 psig to friction as the gas is transported to the plant. Such gas would arrive at the plant with a pressure of 900 psig. Then, as the producer cryogenically separates natural gas liquids, the pressure of its residue gas would fall to 400 psig. The producer would then boost that gas by 700 psig, to reach its marketable pressure of 1,100 psig. Under Ovintiv's methodology, such a producer could deduct the costs of 800 psig of compression: (1000 psig + 700 psig) [the total compression applied] - (1,100 psig [marketable pressure] – 200 psig [wellhead pressure]). Yet only 300 psig of compression appears to have been required to transport the gas.

But for three Ovintiv-Serviced fields, Ovintiv had failed to identify precisely where its gas reached marketable pressure by supplying actual inlet and outlet pressures from each compressor station. Id. at 82. As a result, the Director found that she could not determine what of Ovintiv's claimed field compression was allowable and affirmed ONRR's rejection of Ovintiv's requests. See id. ("Because Ovintiv did not show that it requested only costs from compressor stations downstream of the location where the gas reached 1,000 psig, Ovintiv did not demonstrate its requested allowance included only allowable compression.").[5]

The Director also affirmed ONRR's denial of Ovintiv's request to deduct its field compression costs from its Third-Party Serviced Fields. For these fields, the Director found that Ovintiv had both failed to demonstrate when the gas reached marketable pressure and had not offered actual data for the relevant year: 2012. Id. at 82–83. Instead, Ovintiv had supplied data from 2013-2016 and February 2017 because its third-party processors were unwilling to provide it with data for 2012. Id. at 83; Pl.'s Sealed Mot. at 20.

Finally, the Director turned to Ovintiv's alternate claim that it could deduct the costs of its Meeker Plant compression, rather than its field compression. The Director again found that Ovintiv could not substantiate its refund request because it had not identified the point at which its gas reached marketable pressure. A.R. at 84. More fundamentally, the Director concluded that Ovintiv's attempt to deduct the costs of the Meeker Plant compression violated express regulatory prohibitions on deducting the costs of "boosting." Id. at 86–87.

Ovintiv appealed the Director's Decision to IBLA. Pl.'s Sealed Mot. at 21. When 33 months passed without IBLA resolving the appeal, the Director's decision was automatically

[5] The Director also found that for certain fields where Ovintiv owned preplant compressor stations, Ovintiv improperly calculated what costs were attributed to compressing its gas, as opposed to dehydrating it. See A.R. at 83–84.

affirmed, the Board lost jurisdiction over the dispute, and Ovintiv gained the right to judicial review under the Administrative Procedure Act. 30 U.S.C. § 1724(h)(2); see also Pl.'s Mot. at 22; Gov't Mot. at 9.

Ovintiv then sued the Department of the Interior and its Secretary in this Court, alleging, as relevant here, that the denial of Ovintiv's requests violated the APA because it was arbitrary and capricious and contrary to law. Compl. [ECF No. 1] at 28–29. After a lengthy stay, see May 20, 2024 Min. Order, the parties filed cross-motions for summary judgment and submitted the administrative record to the Court. See Pl.'s Mot.; Gov't Mot.; A.R.

## LEGAL STANDARD

The APA requires that courts "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Because "it is axiomatic that an agency is bound by its own regulations," agency action that fails to comply with those regulations is not in accordance with law. Erie Boulevard Hydropower, LP v. FERC, 878 F.3d 258, 269 (D.C. Cir. 2017) (citation modified); see also E. Band of Cherokee Indians v. DOI, 534 F. Supp. 3d 86, 97 (D.D.C. 2021) (explaining that agency action is contrary to law "if it violates some extant federal … regulation").

The APA also imposes an obligation on agencies to act reasonably and "reasonably explain[]" their decisions. Env't Def. Fund v. EPA, 124 F.4th 1, 11 (D.C. Cir. 2024) (quoting FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021)). So while an agency may change its position over time, it "may not ... depart from a prior policy sub silentio or simply disregard rules that are still on the books." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009). Nor may an agency "ignore[] the reasonable reliance interests of regulated parties." Affirmed Energy, LLC v. FERC, 166 F.4th 1070, 1079 (D.C. Cir. 2026).

Summary judgment "serves as the mechanism for deciding, as a matter of law, whether [an] agency action is supported by the administrative record and otherwise consistent with the APA standard of review." Albino v. United States, 78 F. Supp. 3d 148, 163 (D.D.C. 2015). The court reviewing the agency's decision does not "substitute its judgment for that of the agency," Motor Vehicle Mfrs. Ass'n v. State Farm, 463 U.S. 29, 43 (1983), but assesses only "whether there has been a clear error of judgment," DHS v. Regents of the Univ. of Cal., 591 U.S. 1, 16 (2020) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)). Put differently, at the summary judgment stage of an APA action, "the district judge sits as an appellate tribunal limited to determining whether, as a matter of law, the evidence in the administrative record supports the agency's decision." WildEarth Guardians v. Zinke, 368 F. Supp. 3d 41, 58 (D.D.C. 2019) (citation modified). Where, as here, an interim agency decision was subsequently affirmed by operation of law and without further reasoning, the court reviews the interim decision. See Ovintiv USA, Inc. v. Haaland, 665 F. Supp. 3d 59, 71 (D.D.C. 2023).

## DISCUSSION

In its requests to exceed the transportation allowance limit and for a refund, Ovintiv sought to include one of two sets of costs in its transportation allowance: (1) its Meeker Plant compression costs, or (2) its field compression costs for both its Third-Party and Self-Serviced Fields. The Director denied Ovintiv's requests across the board, citing different rationales for disallowing the compression costs Ovintiv incurred at the Meeker Plant, the Third-Party Serviced Fields, and its Self-Serviced Fields. The Court, then, considers whether the Director's decision to exclude the compression costs incurred at each of these three locations complied with the APA.

### I. THE MEEKER PLANT COMPRESSION

The Director rejected Ovintiv's request to deduct the costs of compression applied at its Meeker Plant, first finding that this compression constituted "boosting," and then concluding that

the relevant regulations categorically forbid the deduction of boosting costs. A.R. at 86 (citing 30 C.F.R. § 1202.151(b)). While Ovintiv does not dispute that its Meeker Plant compression is boosting, it contends that the Director misconstrued the relevant regulations when determining that boosting costs were disallowed. Pl.'s Mot. at 31–34. Ovintiv thus asserts that the Director's denial of its request to include the costs of its Meeker Plant compression in its transportation allowance was not in accordance with law. Id.; see also Erie Boulevard Hydropower, LP, 878 F.3d at 269; Cont'l Res., Inc. v. Gould, 410 F. Supp. 3d 30, 36 (D.D.C. 2019) (finding that an ONRR Director's Decision was contrary to law when it was premised on a "plainly erroneous" reading of the agency's regulation).

To determine whether ONRR erred when construing its own regulations, the Court begins, as it must, with the regulations' text. Kisor v. Wilkie, 588 U.S. 558, 573 (2019). Section 1202.151(b) provides, in relevant part, that:

> A reasonable amount of residue gas shall be allowed royalty free for operation of the processing plant, but no allowance shall be made for boosting residue gas or other expenses incidental to marketing, except as provided in 30 CFR part 1206.

30 C.F.R. § 1202.151(b) (emphasis added). In other words, the costs of boosting residue gas must be borne by the lessee, not the government, unless a separate product valuation regulation permits their deduction. See id. Ovintiv contends that the transportation allowance rule, which is a product valuation rule, supplies such an exception. The transportation allowance rule authorizes lessees to deduct from the royalty value of their production:

> Supplemental costs for compression, dehydration, and treatment of gas.… only if such services are required for transportation and exceed the services necessary to place production into marketable condition required under [the Marketable Condition Rule].

30 C.F.R. § 1206.157(f)(9) (2012).

But it is Ovintiv, not the Director, that misconstrues these two regulations. Under the canon of reverse ejusdem generis, "the phrase 'A, B, or any other C' indicates that A is a subset of C." Safe Food & Fertilizer v. EPA, 350 F.3d 1263, 1269 (D.C. Cir. 2003), on reh'g in part, 365 F.3d 46 (D.C. Cir. 2004) (quoting United States v. Williams–Davis, 90 F.3d 490, 508–09 (D.C. Cir. 1996)). Section 1202.151(b) thus establishes not only that boosting compression is disallowed by default but also clarifies that "boosting residue gas" is an "expense[] incidental to marketing." 30 C.F.R. § 1202.151(b). Section 1206.157(f)(9), for its part, only authorizes the deduction of supplemental compression services if they "exceed the services necessary to place production into marketable condition." Boosting compression, which always works to make gas marketable, does not qualify.

As § 1206.157(f)(9) does not supply an exception to § 1202.151(b)'s baseline prohibition on deducting the costs of boosting compression, and neither Ovintiv nor the Court has identified another product valuation rule that does, Ovintiv may not deduct the costs of the Meeker Plant compression. The Director's denial of Ovintiv's request to do so was therefore in accordance with law, and the Court will deny Ovintiv's motion for summary judgment as to the Meeker Plant compression and grant the government's cross-motion.

## II. THE FIELD COMPRESSION

In its requests to ONRR, Ovintiv claimed that if it could not deduct its Meeker Plant compression costs, it ought to be permitted to deduct its field compression costs, both for its Third-Party Serviced Fields and its Self-Serviced Fields. The Court now turns to the Director's decision to disallow deduction of these alternative costs.

### A. THE THIRD-PARTY SERVICED FIELDS

The Director denied Ovintiv's request to deduct its compression costs from the Third-Party Serviced Fields, in part because Ovintiv had failed to submit actual data for 2012 to substantiate those costs. A.R. at 82–83. Ovintiv asserts that this determination violated the APA by imposing

a new and impossible standard on lessees seeking refunds, Pl.'s Sealed Mot. at 34–37, but the Court finds no error in the Director's decision.

Under the regulations in effect in 2012, oil and gas lessees seeking to take a transportation allowance in excess of 50% of the value of their production were required to demonstrate that their transportation costs "were reasonable, actual, and necessary" by submitting "all relevant and supporting documentation" to ONRR. 30 C.F.R. § 1206.156(c)(3) (2012).

As Ovintiv acknowledges, it submitted data only from 2013–2016 and February 2017 for its Third-Party Serviced Fields. Pl.'s Sealed Mot. at 20; A.R. at 83. Yet data from other years, by definition, does not reflect the actual costs Ovintiv sought to deduct for 2012. See, e.g., Actual, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/actual (last visited Sept. 14, 2026) (defining "actual" as "existing or occurring at the time" (emphasis added)). So ONRR did not violate the APA when it faithfully applied its own longstanding regulation and rejected Ovintiv's requests as to these fields for failure of proof.

Ovintiv insists otherwise, asserting that ONRR's diligent application of its regulations violated Ovintiv's due process rights by imposing an impossible requirement. See Pl.'s Sealed Mot. at 35 (citing All. for Cannabis Therapeutics v. DEA, 930 F.2d 936, 940 (D.C. Cir. 1991)). But while it is true that Ovintiv was unable to obtain actual data from the third parties supplying compression in these fields in 2012, the Court disagrees with Ovintiv's characterization of the actual-data requirement as demanding the unattainable.

To begin, Ovintiv did obtain data from third parties for other years, suggesting that its troubles obtaining 2012 data may have stemmed from its failure to negotiate data-sharing terms in its 2012 contracts or from the many years that elapsed between 2012 and when it submitted its request to exceed. Yet neither of those difficulties are attributable to ONRR's actual data rule.

And in any event, Ovintiv represents that ONRR permits lessees without access to third-party information to rely on modeling, installation quotes, and other materials to approximate a lessee's actual costs for the review period. See Pl's Br. at 35. Yet Ovintiv does not appear to have availed itself of any of these ONRR-approved methodologies. Instead, it insisted that data from other years must suffice, even as 30 C.F.R. § 1206.156(c)(3) required a showing of actual costs, whether through direct or indirect means.

Ovintiv has also not shown that the Director's decision imposed a new, unreasoned, and unpublished procedural rule. See Pl.'s Sealed Mot. at 36–37. As the Court has explained, ONRR's rejection of Ovintiv's alternate-year data was a common-sense application of its actual-data rule, which predated the Director's decision and had been previously published in the Federal Register. See 30 C.F.R. § 1206.156(c)(3) (2012).

In short, the Director's denial of Ovintiv's requests for failure to submit actual compression cost data from its Third-Party Serviced Fields for 2012 was not arbitrary, capricious, an abuse of discretion, or contrary to law. See 5 U.S.C. § 706(2)(A). Accordingly, the Court will deny Ovintiv's motion for summary judgment and grant the government's motion as to the Third-Party Serviced Fields.

**B. THE OVINTIV-SERVICED FIELDS**

Ovintiv also sought a royalty refund for its Self-Serviced Fields and submitted actual, 2012 data to ONRR for most of these fields. See A.R. at 82–83; Pl.'s Sealed Mot. at 39–40.[6] The Director nevertheless rejected Ovintiv's requests as to the Self-Serviced Fields, finding that they

[6] The Director's Decision states that for an indeterminate subset of what appear to be Ovintiv's Self-Serviced Fields, Ovintiv submitted actual pressures but failed to submit its corresponding actual costs. See A.R. at 83–84. To the extent that Ovintiv failed to submit actual supporting data for some of its Self-Serviced Fields, the Court determines that the Director complied with the APA and the relevant regulations when denying Ovintiv's requests as to those fields, for the reasons discussed when addressing Ovintiv's Third-Party Serviced Fields.

did not comply with the Marketable Condition Rule. A.R. at 81–82, 86–87. Specifically, the Director faulted Ovintiv for failing to identify which compression costs were incurred after its production reached marketable pressure. Id.

Ovintiv objects that the "bright-line" rule that the Director applied—only compression applied after the place where production reaches marketable pressure may be deducted as a transportation cost—broke with longstanding Department precedent. Pl.'s Mot. at 26–27. And Ovintiv further argues that ONRR did so without acknowledging that it was changing position or explaining its reasons for doing so. Id. at 27. Upon close examination of the Director's decision, and prior, binding decisions from ONRR, the Court agrees.

i. The Director's Decision Altered ONRR's Position as to Lessees' Calculation of Their Transportation Allowances

To understand how the Director's decision broke from longstanding Department policy, the Court must look back to an earlier decision, binding on the Department, which addressed the computation of a lessee's transportation allowance—the Devon Valuation Determination Letter (Devon VDL). See Valuation Determination for Coalbed Methane Production from the Kitty, Spotted Horse, and Rough Draw Fields, Powder River Basin, Wyoming, Assistant Secretary's Valuation Determination (Oct. 9, 2003), aff'd Devon Energy Corp. v. Kempthorne, 551 F.3d 1030 (D.C. Cir. 2008);[7] see also Fina Oil & Chem. Co. v. Norton, 332 F.3d 672, 675 (D.C. Cir. 2003) (observing that Assistant Secretary determinations are binding on the Department); 30 C.F.R. § 1206.148(c)(1) (providing that Assistant Secretary Valuation Determinations are binding on ONRR).

In 2003, an Assistant Secretary of the Department of the Interior published the Devon VDL to advise a lessee as to how the Department distinguishes deductible compression costs attributable

[7] The Devon VDL may be found in the administrative record. See A.R. at 107–41.

to transportation from nondeductible compression costs attributable to marketing. Devon VDL at 8–9. This letter detailed the lessee's operational scheme, which the Court briefly summarizes here.

In each of the Devon VDL lessee's coalbed methane fields, it gathered methane gas from between 2 and 30 wellheads to a central delivery point. Id. at 1–2. After the gas passed through these central delivery points, the lessee piped it anywhere from a few hundred feet to 2.25 miles to a "screw compressor." Id. at 2. The screw compressor compressed the gas from between 2-10 psig to 80-100 psig. Id. Following its compression by the screw compressor, the gas then traveled up to 5.7 miles, depending on the field, to "reciprocating compressors," which compressed the gas again from between 80-100 psig to either roughly 550 psig or 800 psig. Id.

After exiting the reciprocating compressors, the gas traveled another roughly 28 miles to a compressor inaptly named the "MTG Booster" (the MTG Booster applied field compression; it did not boost processed residue gas). Id. at 5–7. The lessee's gas, having lost pressure during its journey to the MTG Booster, was recompressed a third time from approximately 450-500 psig to approximately 1,200 psig—100 psig greater than its marketable pressure. See id. at 7, 29. Finally, the gas traveled 96 miles to a processing plant, losing approximately one third of its pressure as it went. Id. at 7. Once at the plant, the gas was treated to remove water and carbon dioxide, and recompressed from approximately 800 psig to 1,100 psig, at which point the treated gas was delivered into one of two pipelines. Id. The gas was not cryogenically processed or boosted because coalbed methane does not contain natural gas liquids. Id.; see, e.g., Natural Gas Explained (distinguishing "wet" natural gas which often contains natural gas liquids which must be removed, from coalbed methane which can enter natural gas pipelines without this treatment).

The Devon VDL determined that the costs of the lessee's screw compressors and reciprocating compressors were not deductible transportation costs because those compressors

brought the gas "part way to pipeline pressure/marketable condition." Id. at 29. But the MTG Booster presented a different story. It was only necessary because the plant was more than 100 miles away from the reciprocating compressors. See id. at 30 (noting that if the plant and its connections to the delivery pipelines "had been located at or near the field, there presumably would have been no MTG Booster before the plant"). As a result, the compression the MTG Booster supplied was not "a necessary component of bringing the gas to the relevant pipelines pressure" and so its costs were deductible. Id.

Critically, it was irrelevant to the Assistant Secretary that at the point the lessee's gas entered the MTG Booster, the gas was several hundred psig beneath marketable pressure. See id. at 7, 29. What mattered was that the MTG Booster's "primary function, under the facts of [the case]" was transportation and that the lessee had satisfied its obligation to place its production in marketable condition at other places in its operational scheme. Id. at 31. It had borne the costs to compress its gas from wellhead pressure to approximately either 550 psig or 800 psig using its screw and reciprocating compressors, and from 800 psig to marketable pressure using its plant compressor. See id. at 1–2, 7. Furthermore, as the lessee was not cryogenically processing its gas, dropping its pressure to extract natural gas liquids and then boosting it, the lessee was not required to place its production in marketable condition more than once. See id. at 30 & n.23 (remarking that the lessee was "not required to condition the production to marketable condition more than once at its own expense," but that boosting residue gas supplied an exception to that principle).

The Director's decision in this case is thus irreconcilable with the Devon VDL. The Director held that only compression applied after gas reaches marketable pressure could be included in a lessee's transportation allowance, whereas the Devon VDL permitted a lessee to deduct compression costs incurred before its production reached marketable pressure. And neither

the Director's decision nor the government's briefing cite any subsequent binding precedent rejecting the Devon VDL's method for calculating a lessee's transportation allowance.[8] The Court therefore finds that the Director's decision changed ONRR's position on what compression costs may be included in a lessee's transportation allowance. See FDA v. Wages & White Lion Invs., L.L.C., 604 U.S. 542, 569 (2025) (declaring that an agency changes position when it acts inconsistently with its earlier position or declares prior agency action is no longer good law).

Of course, the Department is not bound by the Devon VDL forever. ONRR may change its position—but it must comply with the APA when it does so. See Fox Television Stations, 556 U.S. at 515. The Court therefore proceeds to consider whether the Director's decision to alter Department policy, as announced in the Devon VDL, satisfied the APA's demands.

ii. The Director's Rejection of the Devon VDL Was Arbitrary and Capricious

An elementary rule of administrative law is that agencies may not depart from their prior policies "sub silentio" or ignore their own, binding rules. See id.; Prohibition Juice Co. v. FDA, 45 F.4th 8, 20 (D.C. Cir. 2022); Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin., 41 F.4th 586, 603 (D.C. Cir. 2022). The Director's decision stumbles at this early hurdle.

In her denial of Ovintiv's request, the Director remarked that "ONRR no longer determines whether a particular compressor station's primary function is placing the gas in marketable condition or transportation. … Consequently, while [the Devon VDL] provides insight into the history of the marketable condition rule, it does not affect the outcome here." A.R. at 88. Implied in this statement is the premise that a binding decision has already abrogated the Devon VDL, so

[8] Indeed, the government's brief to this Court cites only to the Director's decision for its proposition that Ovintiv was obligated to show that its "claimed compression costs solely served a transportation purpose downstream from where its production had been placed in marketable condition." Gov't Mot. at 16, 18 (emphasis added).

the Director's decision made no further change. But the Director's decision does not cite any subsequent precedent in support of this proposition.[9]

What's more, the government's briefing here does not embrace the Director's rejection of the Devon VDL. It instead assumes that the Devon VDL continues to govern transportation valuations, together with subsequent, compatible cases that disallow the deduction of compression services with both transportation and non-transportation purposes. See Gov't Mot. at 18–20 (asserting, without acknowledging that the MTG Booster compression would be disallowed under the Director's new rule, that the Director's decision "conforms to relevant principles of the Devon VDL and other applicable law").

ONRR's failure to acknowledge the Director's policy shift—either in the Director's decision, or in its motion to this Court—establishes the arbitrariness of the decision to disallow the deduction of any of the compression costs Ovintiv incurred in its Self-Serviced Fields, and thus the failure to comply with the APA. See Fox Television Stations, 556 U.S. at 515.[10]

Because the Director's decision broke with binding Department policy when it denied Ovintiv's requests on the basis that only compression applied after production reached marketable

[9] In support of its location-based rule, the Director marshals only a nonprecedential IBLA decision. See A.R. at 80 & nn.63–64 (citing ConocoPhillips Co., I.B.L.A. 2013-2211, 10 (July 13, 2015)).

The Director's other citations do not support its location-based rule. For example, the Director cites Burlington Resources Oil & Gas Co., 183 I.B.L.A. 333, 355 (Apr. 23, 2013). See A.R. at 80 & nn.63–64. That case simply restates the uncontroversial principle that "while compression may be useful for transportation or processing, once it is properly determined that compression is necessary to place the gas at issue in a marketable condition, it cannot also be the subject of a processing or transportation allowance." Burlington Res. Oil & Gas Co., 183 I.B.L.A. at 355. But as the Devon VDL illustrates, compressors may exclusively serve a transportation function even if they are located prior to the point where a lessee's gas reaches marketable pressure. The IBLA decision thus does not establish that all compression upstream of where a lessee's gas reaches marketable pressure is necessary to place the gas in marketable condition. Only the Director's decision here attempts to do so.

[10] The Court reiterates, however, that ONRR is not bound by the Devon VDL forever. So long as the Department acknowledges that it is changing position, considers the reliance interests of regulated parties, explains its reasons for the change, and complies with any other pertinent internal procedures, it may adopt a new construction of its regulations. See Wages & White Lion Invs., L.L.C., 604 U.S. at 570.

pressure could be included in a lessee's transportation allowance, and did not acknowledge that it was doing so, the Decision was arbitrary and capricious. The Court will therefore grant Ovintiv's motion for summary judgment as to the deduction of field compression costs for its Self-Serviced Fields, and deny defendants' cross-motion as to these fields.

## III. REMEDY

When a district court finds that an agency has acted arbitrarily or capriciously, and that the agency's action therefore must be set aside, it generally must remand the case back to the agency for resolution. See Ovintiv USA, Inc., 665 F. Supp. 3d at 81. Seeing no reason to depart from the default approach in this case, the Court will issue a limited remand to the IBLA for it to reconsider its denial of Ovintiv's transportation allowance requests as to its Self-Serviced Fields.

The Court emphasizes, however, that it has reviewed the Director's decision only for compliance with the APA and the relevant regulations. See Albino, 78 F. Supp. 3d at 163 (explaining that district courts consider whether "[an] agency action is supported by the administrative record and otherwise consistent with the APA"). The Court has neither passed on nor endorsed Ovintiv's methodology for calculating its transportation allowance, so the IBLA need not accept that methodology as it evaluates whether Ovintiv's requests are meritorious.

## CONCLUSION

For the reasons explained above, the Court will GRANT Ovintiv's motion for summary judgment as to its Self-Serviced Fields for which it supplied ONRR with actual data, and DENY the government's cross-motion as to the same. The Court will further GRANT the government's cross-motion as to costs from all other areas of Ovintiv's production, and DENY Ovintiv's motion

as to the same. Finally, the Court will REMAND to the agency for further proceedings consistent with this Memorandum Opinion.

An Order consistent with this Opinion shall issue.

**SO ORDERED.**

/s/
JOHN D. BATES
United States District Judge

Dated: September 16, 2026